Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, modifies and affirms the Opinion and Award of the Deputy Commissioner.
 *********** EVIDENTIARY RULING
The parties were unable to reach an agreement on a pre-injury average weekly wage for plaintiff. Defendants, prior to the closing of the record, moved that a package of materials consisting of copies of checks written to plaintiff in 1996 and 1997, produced by counsel for plaintiff, be admitted into the record.
In view of the above and because the Industrial Commission must make findings with regard to the average weekly wage, the Full Commission affirms the Deputy Commissioner's ruling granting defendants' motion. The package of copies of checks is admitted into the record.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
3. The General Credit Insurance Company (now North Carolina Insurance Guaranty Association) is the carrier at risk.
4. Defendant-employer regularly employees three or more employees.
5. Plaintiff was employed by defendant-employer on 28 July 1997 as President and Chief Executive Officer.
6. The parties stipulated into evidence, without need for further identification or verification, medical records, documents and forms, including the depositions of Dr. Adrian VanBakel and Dr. Kirk Walker.
 ***********
Based upon all the competent evidence, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 51 years old. He has a degree in mechanical engineering from Louisiana State University. Plaintiff is accredited by the North Carolina Department of Health and Human Resources as an asbestos supervisor, project designer, inspector and management planner.
2. In 1987, plaintiff formed Republic Industries to perform general contracting, specializing in asbestos removal. Plaintiff is the President and CEO of the company. Plaintiff is the sole shareholder of defendant-employer and although defendant-employer is a C corporation it operates more like a sole proprietorship. Prior to the date of his injury, plaintiff's primary job duties consisted of researching and bidding potential projects for defendant-employer, maintaining accounts and books, and managing ongoing projects. Plaintiff occasionally engaged in physical labor in the performance of his job when training or showing an employee how to perform a specific task.
3. On 28 July 1997, plaintiff was managing several ongoing projects in southeastern North Carolina on behalf of defendant-employer. These included projects in Jacksonville as well as the removal of asbestos floor tile at the annex of the Annie Snipes School in Wilmington.
4. During the days preceding 28 July 1997, areas of the Annie Snipes School project were sealed and vented as required for asbestos removal. After the appropriate sealing of the areas, asbestos tile was removed.
5. On 28 July 1997, glue was applied to the sub-flooring in those areas cleared of asbestos tile in preparation for the replacement with vinyl tile. The glue required a period of time to "set up" prior to the application of the vinyl tile.
6. Several hours after the application of glue, plaintiff stopped by on his rounds and discovered that the glue had not "set up" as anticipated. In conversations with his foreman, Sammy Charles, plaintiff requested that the work crew remain on site until the glue set up and to then begin application of the floor tiles.
7. In the late afternoon of 28 July 1997, Mr. Charles, released the work crew.
8. At approximately 7:00 p.m. that evening, plaintiff again stopped by the Annie Snipes School project and discovered that the glue had, in fact, "set up" and was ready for application of the vinyl floor tiles. At that time, only Mr. Charles remained at the project. All of the floor tiles had to be placed within 24 hours or the glue would have had to be removed by chemicals and the process started again. In order to avoid the delay of restarting the glue process, plaintiff began laying tile along with Mr. Charles.
9. The application of floor tile involved strenuous activity, including carrying boxes of vinyl tile weighing approximately 50 lbs. from an outside storage area to the inside of the school. After the tiles were carried to the actual work site, they were pressed into place. Plaintiff participated in all phases of the process.
10. Due to the outside air temperature and humidity as well as the sealing of the areas, the work area was extremely hot and humid to the extent that sweat totally soaked plaintiff's clothes. After a period of time applying the tile, plaintiff realized that they required additional help and he left Mr. Charles to continue laying tile while he went to a motel to gather laborers. He was able to find only one laborer, and they returned to the site.
11. Plaintiff continued his strenuous work carrying boxes of floor tile and laying floor tile for approximately 1½ hours before he felt tightness in his chest and a shortness of breath. Plaintiff informed Mr. Charles that he was going outside to catch his breath. Moments later, Mr. Charles came out of the school and found plaintiff experiencing chest pains and immediately took him to New Hanover Regional Medical Center.
12. Plaintiff was rushed to the emergency room, where he went into cardiac arrest. Plaintiff was resuscitated by defibrillation and was immediately admitted to the cardiac catheterization clinic, where he underwent angioplasty. Later that same night, plaintiff underwent a triple coronary artery by-pass and had an interaortic balloon pump and a left ventricular assist device implanted. He remained at the New Hanover Regional Medical Center until his discharge on 8 August 1997, and was then flown to the Medical University of South Carolina (MUSC) in Charleston for further treatment and potential heart transplant.
13. While at the MUSC, plaintiff was diagnosed as having suffered an acute myocardial infarction, congestive heart failure, embolization of the left lower extremity, multiple pulmonary emboli, bilateral deep venus thrombosis and pneumonia.
14. As a result of the implantation of one of the cardiac assist devices, plaintiff experienced gangrene in the toes of his left foot and, on 9 September 1997, these toes were amputated.
15. Plaintiff was discharged from the MUSC on 18 September 1997 with instructions to return on 26 September 1997. He remained at home convalescing until he was readmitted to New Hanover Regional Medical Center on 24 November 1997, with congestive heart failure and pneumonia. He remained at New Hanover Regional Medical Center until 28 November 1997.
16. Plaintiff was readmitted to the MUSC on 26 January 1998 for continuing cardiac problems and continued care. On 2 April 1998, he underwent a successful heart transplant.
17. Plaintiff was discharged from the MUSC on 26 April 1998, with instructions to follow up with the transplant service and remain in the Charleston area for several months. He remained under the care of the cardiac transplant clinic and reported that he had returned back to work by 28 July 1998, doing paperwork.
18. Plaintiff has made a good recovery from his heart attack and transplant, but remains on immunosuppressant drugs which require constant monitoring by the transplant service at MUSC. There is a substantial risk of need for future medical treatment.
19. Dr. Joseph Helak, plaintiff's treating cardiologist in Wilmington, testified that the loss of plaintiff's toes was a direct result of the medical care he received to treat his heart attack and that the strenuous working conditions and the heat and humidity of the working environment may have caused plaintiff's heart attack on 28 July 1997.
20. Dr. Kirk Walker, a cardiologist formerly with the MUSC, testified that the working conditions and the working environment were causally related to the onset of plaintiff's heart attack of 28 July 1997.
21. Dr. VanBakel, a cardiologist associated with the MUSC, testified that, in his opinion, the heart attack experienced by plaintiff on or about 28 July 1997 was precipitated by the strenuous working conditions and the heat and humidity of the working environment.
22. All three doctors testified that the treatment received in Wilmington and at MUSC were reasonable and necessary to treat plaintiff's heart attack.
23. Defendant-employer has always been a marginally successful operation and, during shortfalls in cash flow, plaintiff would forego a salary. Defendant-employer often experienced lulls in business. Plaintiff typically worked hard in the summer and drew unemployment in the winter. When plaintiff did not receive a paycheck, his salary did not accrue. Plaintiff's social security earnings records reflect that, plaintiff had no earnings in 1992 and 1993. In 1994, he earned $24,000.00; in 1995, $16,400.00; and in 1996, $11,200.00. Plaintiff's social security earnings reflect that he had total earnings of $35,200.00 in 1997. A 10 March 2000 register indicates that plaintiff received checks totaling $21,200.00 from 1 January 1997 through the date of his heart attack on 28 July 1997. The 10 March 2000 register indicates that, of plaintiff's entire 1996 earnings of $11,200.00, the amount of $9,100.00 was paid to plaintiff for periods of time after 28 August 1996. Accordingly, plaintiff's earnings during the 52-week period prior to his 28 July 1997 heart attack equals $31,300.00, supporting an average weekly wage of $601.92 and an associated compensation rate of $401.30.
25. Plaintiff's 10 March 2000 register indicates that plaintiff received checks totaling $14,000 between 28 July 1997 and 5 November 1997, a period during which plaintiff was primarily convalescing at home. The question of whether these sums are wages for purpose of determining post-injury compensation is complicated in this case because it was plaintiff's practice that he would be paid when the business had money and that he would not be paid if the business did not have money. Thus, under plaintiff's history with defendant-employer, plaintiff's compensation was not always related to the services he actually performed during the period that he received the payment. The greater weight of the evidence is that plaintiff was not engaged in substantial gainful activity during the 28 July 1997 through 5 November 1997 period that the payments were made to him. Rather, the evidence supports the conclusion that these payments were made to plaintiff because the business was successful due to activities performed by plaintiff before the date of injury and plaintiff was in need of money to pay living and other expenses. Therefore, the greater weight of the credible evidence is that these sums were not paid for services provided by plaintiff after the date of injury, but are either compensation based on activity performed prior to the date of injury (i.e., deferred compensation), a distribution of profit, or other gratis distribution by defendant-employer to plaintiff. Further, the greater weight of the credible evidence establishes that defendant-employer's business suffered a loss of business as a direct result of plaintiff's inability to work during this time period, the profitability of the business subsequently declined, defendant-employer had to borrow money secured by plaintiff's home in order to continue business, and the business was not able to pay plaintiff for subsequent services that were later actually performed. Because the $14,000 is not remuneration for services actually performed by plaintiff during the July-November 1997 period, these payments are not wages and do not constitute evidence of partial incapacity and do not negate the finding that plaintiff was totally incapacitated from work during the period of 29 July 1997 and 5 November 1997.
26. The Form 22 wage charts offered into evidence by plaintiff are incomplete, do not reflect plaintiff's work attendance or pay amounts, and are inconsistent with other evidence in the record; therefore, these documents are not accepted as credible evidence of plaintiff's wages.
27. Plaintiff's heart attack of 28 July 1997 was the result of the unusual physical activity and stress he experienced at work on that date. Further, the loss of the toes of plaintiff's left foot is causally related to his work-related injury. As a result of plaintiff's heart attack, he was unable to work from 28 July 1997 until 23 June 1998, with the limited exceptions noted above.
28. Subsequent to the hearing before the Deputy Commissioner, the North Carolina Insurance Guaranty Association was substituted for Credit General Insurance as the carrier on the risk. The Caption reflects that change.
29. Plaintiff received unemployment benefits in 1997, subsequent to his heart attack. Defendant-carrier is entitled to a credit for the unemployment benefits actually paid to plaintiff.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's heart attack of 28 July 1997 was caused by unusual exertion which was not within the usual and normal part of plaintiff's work routine. Plaintiff's work activity on that date thus constitutes an unlooked for and untoward event which was not expected or designed by plaintiff. Accordingly, plaintiff's heart attack was an injury by accident arising out of and in the course of his employment. G.S. §97-2(6).
2. Plaintiff's average weekly wage was $601.92 per week, which yields a compensation rate of $401.30 per week. G.S. § 97-2(5).
3. As a result of plaintiff's compensable injury by accident on 28 July 1997, plaintiff is entitled to total disability compensation from 28 July 1997 until 23 June 1998 in the weekly amount of $401.30. G.S. § 97-29. Defendant-carrier is entitled to a credit for unemployment benefits actually paid to plaintiff during this period. If the parties are not able to reach agreement concerning the amount of this credit, they may seek a hearing to determine this value.
4. Defendant-carrier is not entitled to an offset for the $14,000.00 paid to plaintiff from 28 July 1997 through 5 November 1997, because this sum is not wages paid to plaintiff for services actually performed during this period. G.S. § 97-29.
5. Plaintiff's medical treatment as a result of his heart attack, including but not limited to his heart transplant, the surgery on his left foot, and mediations to maintain his transplanted heart, was and are necessary to effect a cure, give relief and lessen plaintiff's period of disability. There is a substantial risk of necessity of future medical. G.S. §§ 97-25, 97-25.1.
6. Notice of the claim to defendant-employer and the written notice provided to defendant-carrier on 3 February 1998 is reasonably excused due to plaintiff's repeated hospitalizations and serious medical condition. Defendants were not prejudiced due to the lateness of the notification. G.S. § 97-22.
7. Plaintiff is entitled to 75 weeks of compensation at the rate of $401.30 per week for the loss of his toes. G.S. § 97-31(8).
8. As a result of plaintiff's accident, he has sustained permanent injury to an important internal organ, his heart, and is entitled to payment in the discretion of the Industrial Commission in the amount of $20,000.00. G.S. § 97-31(24).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff $401.30 per week for his total disability from 28 July 1997 until 23 June 1998. Defendants shall also receive credit for any unemployment benefits paid to plaintiff during his period of total disability. The compensation has accrued and shall be paid to plaintiff in a lump sum, subject to the set-off and the approved attorney's fee below.
2. Defendants shall pay plaintiff 75 weeks of compensation at $401.30 per week for the loss of his toes. This amount shall be paid to plaintiff in a lump sum, subject to the approved attorney's fee below.
3. Defendants shall pay plaintiff $20,000.00 for the damage done to plaintiff's heart. This amount shall be paid to plaintiff in a lump sum, subject to the approved attorney's fee below.
4. Defendants shall pay for all medical treatment as a result of plaintiff's heart attack, including but not limited to plaintiff's heart transplant, the amputation of the toes of his left foot, and medications to maintain his transplanted heart, for so long as such treatment gives relief, effects a cure or lessens plaintiff's period of disability.
5. An attorney's fee of 25% of the compensation awarded to plaintiff in paragraphs 1, 2 and 3 of this award is approved. Defendants shall deduct this amount from the lump sum award and send it directly to plaintiff's attorney.
6. Defendants shall pay the costs, which include an expert witness fee in the amount of $200.00 to Dr. Kirk W. Walker and $250.00 to Dr. Adrian VanBakel.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER